Steven J. D. Stuart
Suite 281
454 Las Gallinas Avenue
San Rafael, California 94903
Tel: 415.955.7163
Email: Steven@twin-flames.net

Plaintiff in Propria Persona

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

Case No. CV16 4267

Steven J. D. Stuart,

    Plaintiff,

v.

DNC SERVICES CORPORATION, d.b.a. DEMOCRATIC NATIONAL COMMITTEE, HILLARY DIANE RODHAM CLINTON,

    Defendants,

_____/

COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY RELIEF

GENERAL ALLEGATIONS

AS AND FOR GENERAL ALLEGATIONS AGAINST DEFENDANTS, AND EACH OF THEM, PLAINTIFF ALLEGES:

JURISDICTION AND VENUE

1. This court has original jurisdiction over the actions asserted herein pursuant to 28 U.S.C. § 1331, as district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. The actions asserted herein arise from violations of 18 U.S.C. §§ 793 and 2071, which are laws of the United States.

COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY RELIEF
ST007211.501

Personal jurisdiction is proper as DNC Services Corporation, d.b.a. Democratic National Committee, has availed itself purposefully of the privilege of conducting business activities within this District. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1), because DNC Services Corporation, d.b.a. Democratic National Committee, conducted business in this District, and under 28 U.S.C. § 1391(c)(2), because it is subject to the court's personal jurisdiction with respect to the actions herein in question. Personal jurisdiction is proper because Hillary Diane Rodham Clinton conducted business in this District by campaigning for the nomination for to run for the Office of President of the United States and by soliciting votes to be cast for her to be so nominated. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(1), because Hillary Diane Rodham Clinton has conducted business by campaigning for the nomination to run for the Office of President of the United States and has been soliciting votes therefor, and under 28 U.S.C. § 1391(c)(2), because she is subject to the court's personal jurisdiction with respect to the actions herein in question.

THE PARTIES

2.  At all times relevant hereto, Plaintiff was an adult individual residing in the County of Marin, State of California, and is a registered voter lawfully registered with the Democratic Party pursuant to the laws of the State of California.

3.  At all times relevant hereto, Defendant Hillary Diane Rodham Clinton (hereinafter "Defendant Clinton" or "Clinton") was an adult individual with a principal place of business in New York State, at Office of Hillary Rodham Clinton, 120 West 45th Street, Suite 2700, New York, NY 10036.

4.  At all times relevant hereto, Defendant DNC Services Corporation, d.b.a. Democratic National Committee (hereinafter "Defendant DNC" or "DNC"), was and is a not-for-profit corporation organized under the laws of the District of Columbia and is the operating body of the United States Democratic Party. The DNC maintains its principal place of business at 430 South Capitol Street Southeast in Washington, District of Columbia.

5.    Plaintiff is informed and believes and thereon alleges that at all times mentioned herein, Defendants, and each of them,  were the agents or employees of the co-Defendants, and in doing the things herein alleged, were acting within the purpose and scope of such agency and employment.

FIRST CAUSE OF ACTION

[Injunctive Relief against all Defendants]

As and for a First Cause of Action against Defendants, and each of them, Plaintiff alleges:

6. Plaintiff realleges and incorporates by reference all paragraphs of the General Allegations as though fully set forth at length.

7. In or about 2009, Defendant Clinton was appointed as Secretary of State of the United States of America.  Her job functions included  engaging  in  numerous communications, including email communications, and being entrusted with or having lawful  possession  or  control  of  numerous  communications,  including  email communications.

8.  Title 18 of the United States Code § 793 of the Espionage Act  - Gathering, Transmitting or Losing Defense Information – provides in relevant part as follows:

> Whoever, being entrusted with or having lawful possession or control of any document,  writing,  code  book,  signal  book,  sketch,  photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, note, or information, relating to the national defense, (1) through gross negligence permits the same to be removed from its proper place of custody or delivered to anyone in violation of his trust, or to be lost, stolen, abstracted, or destroyed, or (2) having knowledge that the same has been illegally removed from its proper place of custody or delivered to anyone in violation of its trust, or lost, or stolen, abstracted, or destroyed, and fails to make prompt report of such loss, theft, abstraction, or destruction to his superior officer—  ¶  Shall be fined under this title or imprisoned not more than ten years, or both.  18 U.S.C. § 793(f).

9. While serving as Secretary of State and thereafter Defendant Clinton committed numerous violations of this code section as announced by FBI Director James Comey

pursuant to a criminal investigation regarding Defendant Clinton's conduct. According to FBI Director, the FBI investigation determined that:

I.   110 emails in 52 separate chains had been determined to contain classified information "at the time they were sent or received," contradicting Clinton's claim that she neither sent nor received information that was deemed classified at the time;

II.   Of those 110 emails, eight included "Top Secret" information, while 36 chains had "Secret" information at the time it was received, and eight contained "Confidential" information;

III.   "None of these emails should have been on any kind of unclassified system, but their presence is especially concerning because all of these emails were housed on unclassified personal servers not even supported by full-time security staff;

IV.   In addition to those emails, another 2,000 were "up-classified" to make them "Confidential" after they had already been sent. "But even if information is not marked 'classified' in an email, participants who know or should know that the subject matter is classified are still obligated to protect it," Comey said.

10.   As a result of the wrongful acts of Defendants as herein alleged, Defendants have violated 18 U.S.C. § 793(f) which was in full force and effect at time of said acts.

11.   Plaintiff is within the class of persons to be protected by such laws.

12.   The Constitution of the United States of America acknowledges the right of a citizen to vote.   The Fourteenth Amendment to the U.S. Constitution provides in relevant part as follows:

> But when the right to vote at any election for the choice of electors for President and Vice President of the United States, Representatives in Congress, the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, or in any way abridged, except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male

citizens twenty-one years of age in such State.

As such, the 14th Amendment acknowledges the right to vote and provides penalties for any abridgement of that right.

13. The Fifteenth Amendment to the U.S. Constitution provides in relevant part as follows:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude. U.S. Constitution, 15th Amendment, Section 1.

14. 18 U.S. Code § 2071 provides in relevant part as follows:

> (a) Whoever willfully and unlawfully conceals, removes, mutilates, obliterates, or destroys, or attempts to do so, or, with intent to do so takes and carries away any record, proceeding, map, book, paper, document, or other thing, filed or deposited with any clerk or officer of any court of the United States, or in any public office, or with any judicial or public officer of the United States, shall be fined under this title or imprisoned not more than three years, or both.
>
> (b) Whoever, having the custody of any such record, proceeding, map, book, document, paper, or other thing, willfully and unlawfully conceals, removes, mutilates, obliterates, falsifies, or destroys the same, shall be fined under this title or imprisoned not more than three years, or both; and shall forfeit his office and be disqualified from holding any office under the United States. As used in this subsection, the term "office" does not include the office held by any person as a retired officer of the Armed Forces of the United States. 18 U.S. Code § 2071.

15. As a direct and proximate result of the violations by of 18 U.S.C. § 793(f) by Defendant Clinton as determined by the U.S. Federal Bureau of Investigation in its criminal investigation into her conduct and as enumerated by FBI Director James Comey, the conduct of Defendant Clinton also constitutes violations of 18 U.S. Code § 2071 as set forth above. As a result of said violations of 18 U.S. Code § 2071, Defendant Clinton "shall ... be disqualified from holding any office under the United States." 18 U.S. Code § 2071(b).

16. Accordingly, Defendant Clinton is precluded pursuant to U.S. Federal laws

from holding any public office, including the Office of the President of the United States.

17. The right to vote for "the choice of electors for President ... of the United States" includes the right to have available candidates who are qualified to hold the Office of the President of the United States. The provision of an unqualified candidate defeats the purpose of having a right to vote. No political party can be allowed to offer a candidate who is not qualified to hold the office for which the candidate is running.

18. Given the determinations by the FBI that Defendant Clinton has committed scores of violations of the Espionage Act and that she is, therefore, not qualified to hold office in the United States of America, allowing the Democratic Party to persist and promote Defendant Clinton as a candidate for the Office of the President of the United States infringes Plaintiff's right as a citizen to vote "at any election for the choice of electors for President ... of the United States".

19. As of the date of this writing, Defendant Clinton is the presumptive nominee for the Democratic Party and all signs indicate that she may be nominated as the candidate from the Democratic Party to run for the Office of the President of the United States. If she is so nominated, then Defendant DNC would be infringing Plaintiff's right to vote for a qualified candidate.

20. The right to vote is an inherent right and there is no price that can be placed upon that right. Plaintiff is entitled to an injunction to prevent Defendant DNC from infringing such a right acknowledged by the U.S. Constitution.

21. The DNC is the formal governing body for the United States Democratic Party. The DNC is responsible for coordinating strategy in support of Democratic Party candidates for local, state, and national office.

22. As part of its duties, the DNC organizes the Democratic National Convention every four years to nominate and confirm a candidate for President, and establishes rules for the state caucuses and primaries that choose delegates to the convention.

23. Since 2011, Deborah "Debbie" Wasserman Schultz (hereinafter " Wasserman Schultz") has been Chairperson of the DNC. Wasserman Schultz has also served as the

U.S. Representative for Florida's 23rd congressional district since 2013; before then, she represented Florida's 20th district in the U.S. House of Representatives starting in 2005.

24.  The DNC is governed by the Charter and Bylaws of the Democratic Party. These governing documents expressly obligate the DNC to maintain a neutral posture with respect to candidates seeking the party's nomination for President during the nominating process. Article 5, Section 4 of the Charter states:

> The National Chairperson shall serve full time and shall receive such compensation as may be determined by agreement between the Chairperson and the Democratic National Committee. In the conduct and management of the affairs and procedures of the Democratic National Committee, particularly as they apply to the preparation and conduct of the Presidential nominating process, the Chairperson *shall exercise impartiality and evenhandedness* as between the Presidential candidates and campaigns. The Chairperson shall be responsible for ensuring that the national officers and staff of the Democratic National Committee *maintain impartiality and evenhandedness* during the Democratic Party Presidential nominating process. (emphasis added).

25.  Consistent with what the Charter requires, the DNC, through Wasserman Schultz and other employees, and from the very beginning of the presidential race, has consistently and publicly affirmed its impartiality and evenhandedness with respect to the nominating process for the Democratic nominee for President in 2016. For example:

a) A September 3, 2015, article in *Politico* reporting on Wasserman Schultz's relationships with Hillary Clinton and Joe Biden quoted Wasserman Schultz as saying, "I count both Secretary Clinton and Vice President Biden as dear friends, but no matter who comprises our field of candidates it's my job to run a neutral primary process and that's what I am committed to doing".

b) A September 16, 2015, article in *The Daily Beast* on the Democratic candidate debate schedule quoted DNC spokesperson Holly Shulman ("Shuman") as stating,

"[t]he DNC runs an impartial primary process."

c) Shulman was also quoted in an article appearing in the Daily Mail Online (UK) on October 16, 2015, as stating, "[t]he DNC runs an impartial primary process, period."

d) In a CNN appearance on May 17, 2016, where she discussed alleged "violence" by supporters of Bernie Sanders at the Nevada State Democratic Convention, Wasserman Schultz stated that, "[t]he Democratic National Committee remains neutral in this primary, based on our rules."

e) In a statement quoted by the Associated Press on May 21, 2016, while discussing Sanders' endorsement of her primary opponent for Congress, Wasserman Schultz stated, "[e]ven though Senator Sanders has endorsed my opponent, I remain, as I have been from the beginning, neutral in the presidential Democratic primary."

26. Despite the requirements in the Charter, and in spite of the multiple public declarations of neutrality and impartiality with respect to the Democratic primary process, the DNC was not neutral. To the contrary, the DNC was biased in favor of one candidate – Hillary Clinton ("Clinton") – from the beginning and throughout the process. The DNC devoted its considerable resources to supporting Clinton above any of the other Democratic candidates. Through its public claims to being neutral and impartial, the DNC actively concealed its bias from its own donors as well as donors to the campaigns of Clinton's rivals, including Bernie Sanders ("Sanders").

27. The truth of the DNC's deception started to come to public light in June 2016.

28. On June 14, 2016, officials of the DNC announced that Russian government hackers had penetrated its computer network. The hackers had access to the network for approximately one year. According to the Washington Post, "[t]he intruders so thoroughly compromised the DNC's system that they also were able to read all email and chat traffic" – but in the same article, "[t]he DNC said that no financial, donor or personal information appears to have been accessed or taken".

29. The same day, CrowdStrike – a network security consulting firm retained by the DNC to investigate and respond to the breach – publicly released more details. According to CrowdStrike, two separate hacker groups affiliated with the Russian government, codenamed "Cozy Bear" and "Fancy Bear," were detected as having infiltrated the DNC network. Both groups have a long history of successfully targeting sensitive government and industry computer networks in both the United States and other countries, often using "sophisticated phishing attacks." CrowdStrike concluded that Cozy Bear's intrusion of the DNC network began in summer of 2015, while Fancy Bear separately breached it in April 2016.

30. On June 15, 2016, an individual using the name "Guccifer 2.0" established a publicly accessible website (https://guccifer2.wordpress.com) and posted a statement taking credit for the DNC server hack.8 Below the statement, Guccifer 2.0 posted a series of documents purportedly taken from the DNC's servers including: (a) a 281-page confidential "Donald Trump Report" purportedly submitted to the DNC on 12/19/15 and containing extensive research on the presumptive Republican presidential nominee; (b) Excel spreadsheets containing the names and personal information of donors to the Democratic Party and Hillary Clinton's campaign; and (c) a 59-page memorandum marked "Secret" setting forth national security and foreign policy "promises and proposals" and purportedly obtained from Clinton's personal computer.

31. Among the documents released by Guccifer 2.0 on June 15th is a two-page Microsoft Word file with a "Confidential" watermark that appears to be a memorandum written to the Democratic National Committee regarding "2016 GOP presidential candidates" and dated May 26, 2015.

32. The DNC Memo presents, "a suggested strategy for positioning and public messaging around the 2016 Republican presidential field." It states that, "Our goals in the coming months will be to frame the Republican field and the eventual nominee early and to *provide a contrast between the GOP field and HRC.*" (emphasis added). The DNC Memo also advises that the DNC, "[u]se specific hits to muddy the waters around ethics,

transparency and campaign finance attacks on HRC." In order to "muddy the waters" around Clinton's perceived vulnerabilities, the DNC Memo suggests "several different methods" of attack including: (a) "[w]orking through the DNC" to "utilize reporters" and create stories in the media "with no fingerprints"; (b) "prep[ping]" reporters for interviews with GOP candidates and having off-the-record conversations with them; (c) making use of social media attacks; and (d) using the DNC to "insert our messaging" into Republican-favorable press.

33. By the date of the DNC Memo, the Democratic presidential nomination field already included, in addition to Clinton, Bernie Sanders, who announced his candidacy on April 30, 2015. At the time, there was also widespread speculation that others would soon enter the primary race including Joe Biden, Lincoln Chafee, Martin O'Malley, Elizabeth Warren, and Jim Webb.

34. Despite there being every indication that the 2016 Democratic primary would be contested by multiple candidates, including Sanders, the DNC Memo makes *no mention* of any Democratic candidate except Clinton, and builds the DNC's election strategy on the assumption that Clinton *will be* the nominee, with no doubts attached. Rather than reflecting an "impartial" or "evenhanded" approach to the nominating process, as required by the Charter, the DNC Memo strongly indicates that the DNC's entire approach to the process was guided by the singular goal of elevating Clinton to the general election contest.

35. On June 18 and 21, 2016, Guccifer 2.0 released additional files purportedly taken from the DNC's servers. Among these documents are even more items that appear to be of a highly sensitive nature including: (a) multiple spreadsheets of donors to the DNC and other organizations, including the Clinton Foundation, containing personal information such as names, email addresses, and phone numbers; (b) a "private and confidential" memorandum to Secretary of Defense Ashton Carter from a senior advisor regarding appointments to the Joint Chiefs of Staff; (c) fee, travel, and lodging requirements for Clinton's paid speeches; (d) Clinton's tax returns; and (e) thousands of

COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY RELIEF
ST007211.501

pages of research, apparently prepared by DNC staff as well as Clinton's campaign staff, relating to Clinton's candidacy including her "vulnerabilities," potential attacks, rebuttals, policy positions, and opposition research on the other Democratic candidates.

36. These additional files entail further, substantial evidence that the DNC was anything but "impartial," "evenhanded," or "neutral" with respect to the Democratic nominating process. To the contrary, and in spite of the governing Charter and its multiple public statements, the DNC devoted its resources to propelling Clinton's candidacy ahead of all of her rivals, even if this meant working directly against the interests of Democratic Party members, including Bernie Sanders' supporters.

37. All conditions precedent to the commencement and prosecution to final judgment of this civil action have taken place, have been performed, or have been waived or excused by Defendants.

38. Accordingly, Plaintiff is entitled to a judicial determination after a full trial to determine whether Defendant Clinton qualifies to be the President of the United States given her multiple and rampant violations of 18 U.S.C. § 793(f) and 18 U.S. Code § 2071. Plaintiff also is entitled to a judicial determination after a full trial to determine whether Defendant Clinton qualifies to be the Democratic nominee for President of the United States given multiple and rampant violations of the DNC rules, the elections and primary process and the misrepresentations of a fair and impartial election process as set forth above.

39. By reason thereof, Plaintiff will suffer irreparable harm and injury if Defendants, and each of them, are not restrained temporarily, pending trial and permanently from committing or continuing to commit the following acts prior to a judicial determination after a full trial that Defendant Clinton qualifies to be the President of the United States:

I. Nominating Defendant Clinton to run for President of the United States in any election, specifically the election scheduled for November 2016;

II. Allowing or promoting Defendant Clinton to run for President of the

United States in any election, specifically the election scheduled for November 2016;

III. Maintaining Defendant Clinton as a viable and qualified candidate to run for President of the United States in any election, specifically the election scheduled for November 2016.

40. Plaintiff has no adequate remedy at law for the injuries that are threatened.

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as hereinafter set forth.

SECOND CAUSE OF ACTION

[Declaratory Relief Against all Defendants]

As a for a Second Cause of Action against Defendants, and each of them, Plaintiff alleges:

41. Plaintiff realleges and incorporates by reference all paragraphs of the General Allegations and First Cause of Action as though fully set forth at length.

42. A controversy has arisen between Plaintiff and Defendants, and each of them, with respect to the rights, obligations and duties of the parties. By indicating an intent to nominate Defendant Clinton and thereafter supporting Defendant Clinton as a candidate, Defendants have falsely represented that they have conducted and participated in a fair and impartial election process to nominate Defendant Clinton to run for the Office of President of the United States, as well as Defendants have indicated that Defendant Clinton somehow qualifies to be the President of the United States despite her multiple and blatant violations of 18 U.S.C. § 793(f) and 18 U.S. Code § 2071, as determined by the FBI.

43. As a result of that controversy and the need to protect the Constitutional rights of Plaintiff, It is necessary that the Court conduct a full trial on the issue of whether Defendant Clinton qualifies to be the President of the United States and to issue a clear declaration regarding whether Defendant Clinton has the right to run as a candidate for the Office of the President of the United States and whether or not DNC has the right to promote her as such a candidate.

44. Plaintiff has no adequate remedy at law for the injuries that are threatened.

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as follows:

1. For a temporary restraining order, a preliminary injunction and a permanent injunction restraining Defendants, and each of them, from committing or continuing to commit the following acts:

a. Nominating Defendant Clinton to run for President of the United States in any election, specifically the election scheduled for November 2016;

b. Allowing or promoting Defendant Clinton to run for President of the United States in any election, specifically the election scheduled for November 2016;

c. Maintaining Defendant Clinton as a viable and qualified candidate to run for President of the United States in any election, specifically the election scheduled for November 2016.

2. For a declaration of the rights and duties of Defendants and a specific determination whether Defendant Clinton qualifies to be the President of the United States, whether Defendant Clinton has the right to run as a candidate for the Office of the President of the United States and whether or not DNC has the right to nominate her, promote her and maintain her as such a candidate.

3. For costs of the suit herein;

4. For such other and further relief as the court may deem as just or proper.

Dated: 22 July 2016



Steven J. D. Stuart
Plaintiff in Propria Persona

COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY RELIEF
ST007211.501